**Page 10**

1  A. Yes.
2  Q. Okay. Are you aware that an arbitration
3  award has been entered?
4  A. Yes.
5  Q. Have you done anything to dispute the
6  arbitration award?
7  A. No, I didn't.
8  Q. Have you -- first of all, before today have
9  you ever heard of Wolpoff and Abramson, LLP?
10 A. Yes.
11 Q. When was the first time you heard of them?
12 A. Back in November of 2004.
13 Q. And how did you first hear of them?
14 A. The very first time I heard of them was a
15 phone call that I received.
16 Q. Did -- how do you know that the individual
17 who contacted you was from Wolpoff and Abramson?
18 A. He identified himself from being from
19 Wolpoff and being a collector for MBNA.
20 Q. What specifically was said?
21 A. Specifically? You mean the whole
22 conversation or --
23 Q. Yes.
24 A. I had answered the phone. He said he was so
25 and so from -- the name was a name that I hadn't

**Page 11**

1  recognized before, and he said that he was a
2  collector for MBNA. And see prior to this I had
3  already talked to MBNA back in September. I talked
4  to a Teresa. She had told me -- I told her my
5  situation. She had told me not to worry about it, to
6  get better. So I had told him what this Teresa had
7  told me, and he said that I was mistaken, that they
8  had given him the account for collection.
9  Q. And who was him; did he identify himself?
10 A. I don't know what he said his name was. I
11 couldn't tell you.
12 Q. Okay. But you claim -- your recollection
13 today is that he indicated that he was from Wolpoff
14 and Abramson?
15 A. Yes.
16 Q. Okay.
17    MR. PAYNE: Can I mark this as Exhibit 1?
18    (Exhibit 1 marked for identification.)
19 Q. (By Mr. Payne) Ms. Worch, I'm handing you
20 what's been marked as Plaintiff's Exhibit 1. Do you
21 recognize this document?
22 A. Yes.
23 Q. And could you identify that document for me?
24 A. Is this our first complaint? I guess this
25 is the complaint we made.

**Page 12**

1  Q. Okay. This is the second amended complaint.
2  Is that how it's designated?
3  A. Yes.
4  Q. Okay. And on Page 2 of the factual
5  allegations in Paragraph 9 does it indicate that upon
6  information and belief that the individual that we're
7  talking about -- is this the conversation that we're
8  speaking about today that's embodied in Paragraph 9?
9  A. Right.
10 Q. Okay. And in your petition you say upon
11 information and belief. Did you know at the time
12 that you prepared or had this prepared for you that
13 this individual was a representative of Wolpoff and
14 Abramson?
15 A. Right. Well, the letter -- he said the name
16 -- I mean, the name that he said when I got the
17 letter a couple days later was the name that was on
18 the letter. I mean, you know, it was a name that you
19 would know if you seen it.
20 Q. Okay. Are you basing your knowledge that
21 the person was from Wolpoff and Abramson on the
22 letter that you received or your conversation with
23 this individual?
24 A. Well, based on what he said and then the
25 letter came.

**Page 13**

1  Q. Okay. Did you take any notes during that
2  conversation?
3  A. No. I didn't take any notes during that
4  one.
5  Q. Okay. And when was this conversation?
6  A. It was -- it was a couple days before I got
7  the letter from Wolpoff and Abramson. I can't tell
8  you exactly what day it was.
9  Q. Do you remember what month?
10 A. November.
11 Q. Of what year?
12 A. 2004.
13 Q. Okay. And how did this -- and I apologize,
14 but I'm going to go through this very carefully.
15    What happened when you picked up the
16 telephone?
17 A. Okay. He said that -- asked for me,
18 obviously, and I said this is she. And he said that
19 -- whatever his name was and he was from this Wolpoff
20 and -- I mean, I caught part of -- you know, what I'm
21 saying? You catch bits and pieces of the big name
22 they're from. And he said he was collecting for --
23 he was -- MBNA had given my account to them for
24 collection.
25    I told him that I had already talked to MBNA

**Page 14**

1 a couple months prior to that and that I had talked
2 to a Teresa and that she told me -- I explained to
3 her my situation. She had told me don't worry about
4 it, you know. In fact, she even told me to send them
5 a decreased -- cease and desist letter. And he said
6 -- told me that I must be mistaken because they had
7 gotten the account from MBNA for collections.
8     So then I proceeded to tell him my problem;
9 you know, why I couldn't pay. And I said I had no
10 money.
11     MR. PAYNE: Can we just go off the record
12 for a second?
13     (Thereupon the deposition stood in temporary
14 recess.)
15   A. So anyway I told him that -- just give me a
16 minute.
17   Q. (By Mr. Payne) Certainly.
18   A. I told him that I had used all the money
19 that I had that was in the savings keeping up my
20 bills as long as I could to the credit card
21 companies. And he said that I needed to make
22 arrangements to -- some kind of payment plan. I
23 said, if I had even $25 extra a month, I'd help you.
24 I said, but I don't even know where my next tank of
25 gas is coming from. I can't promise you anything.

**Page 15**

1     Then he proceeded to ask me if I had a home
2 and I said, yes. And he said, do you realize we can
3 take that home from you. And I said, you can't take
4 my home. And he said, do you have a car. Do you
5 have any stocks. Do you have savings. He said, do
6 you realize we can take all of that from you.
7     And at this point I was getting pretty
8 upset, and Joe was in there. I was telling him how
9 can you take this stuff. You know, this is my stuff.
10 I said, I don't even have any equity in my home. And
11 finally Joe told me to hang up the phone so I -- so I
12 hung up the phone. And that was pretty much the last
13 time I would pick up my phone.
14   Q. Did you ever indicate during that
15 conversation that Joe had been laid off during this
16 time period?
17   A. I went through my whole story with him. I
18 went through the whole thing. That's why I couldn't
19 understand why he couldn't understand.
20   Q. How long was your conversation with this
21 individual?
22   A. I don't know. I went through the whole
23 thing. I went through the fact that I worked as long
24 as I could. I told him I'd used all my savings. I
25 said, my husband was laid off. I said, we don't have

**Page 16**

1 any money. I went through the whole story with him,
2 and it was just like he could care less.
3   Q. And this is a male, I'm assuming, that you
4 were speaking with?
5   A. Yes. It was a man.
6   Q. What time was the call initiated?
7   A. I don't know.
8   Q. Did you have any other discussion with this
9 male during that conversation?
10   A. I didn't answer my phone again after that.
11   Q. Well, during this conversation --
12   A. No.
13   Q. -- that we're talking about; anything else
14 discussed?
15   A. Other than I went through my whole
16 situation. I mean, I told him everything.
17   Q. And you indicated that you then terminated
18 the telephone call by hanging up?
19   A. I just hung up, yeah.
20   Q. Okay. Did you do anything in response to
21 the telephone call?
22   A. What do you mean? Like I don't understand
23 what you mean.
24   Q. Did you do anything in response? You
25 indicated that you didn't answer your phone anymore.

**Page 17**

1   A. Right.
2   Q. What else did you do in response to this
3 telephone call?
4   A. You mean besides cry? I mean, I don't
5 understand what you mean.
6   Q. Well, yeah, anything. Any action that you
7 took in response to it; any attempts to contact MBNA
8 or this individual?
9   A. No. I didn't contact -- I was scared to
10 death. I didn't contact the individual back again,
11 no.
12   Q. Okay.
13   A. I mean, I just hung up the phone and that
14 was the end of it. I didn't want to talk to anybody
15 from MBNA anymore.
16   Q. Okay.
17   A. I mean, obviously they lied to me the first
18 time.
19   Q. You never attempted to contact Teresa and
20 straighten this situation out?
21   A. No. He said I was mistaken. He said it was
22 given to him for collection. So I just assumed as
23 usual bill collectors lie to me, so I didn't -- no, I
24 didn't call Teresa.
25   Q. When you say as usual bill collectors lie to

**Page 18**

1  you, have you had experiences similar to this with
2  bill collectors?
3  A. No. I mean, it's just my opinion.
4  Q. What do you base that opinion on?
5  A. This.
6  Q. Okay. Other than this situation, are you
7  basing your opinion on some other incident?
8  A. No. This is the -- this is the bad one.
9  Q. Okay.
10 A. I've never had a bill collector do that to
11 me before.
12 Q. When you say do that, do what?
13 A. Call and make threats like that. I've never
14 had anybody make threats like that to me.
15 Q. Okay.
16 A. And I mean, I don't know the legal -- you
17 know, I don't know the legal process. I don't know
18 what they can and they can't do.
19 Q. Sure. Have you brought any Fair Debt
20 Collection Practices Act against any other firms or
21 individuals other than the instant case?
22 A. Other than MBNA or Wolpoff?
23 Q. Correct.
24 A. No.
25 Q. Have you been sued on debt --

**Page 19**

1  A. Yes, I have.
2  Q. What credit card -- or what debts, I'm
3  sorry, have you been sued on?
4  A. Citibank has sued me.
5  Q. Do you know what county they've sued you in?
6  A. St. Charles.
7  Q. Do you know the cause number?
8  A. No, sir, I don't.
9  Q. When was the case initiated?
10 A. Oh, gosh. I know it was this year. Maybe
11 -- I think I made my first payment in April. So it
12 must have been like March of 2006.
13 Q. Okay. Anyone other than Citibank?
14 A. Take me to court?
15 Q. Yes.
16 A. No.
17 Q. Any other debts that were in collection
18 other than Citibank or MBNA?
19 A. Yes.
20 Q. What debts?
21 A. Should I list them all? I mean, I've got a
22 lot of them.
23 Q. That's fine.
24 A. I've got Fleet. Do you need to know the
25 amounts because I didn't list all this. I've got

**Page 20**

1  Fleet that's in collection. Chase, Bank of America.
2  Gas credit cards like QT, Phillips. I'm trying to
3  think of them all. I had a list at one time. What's
4  the name of them? BP. I think those are the major
5  ones.
6  Q. Have you ever filed --
7  A. I mean, I can't think of them offhand.
8  Q. Have you ever filed for bankruptcy?
9  A. No. I talked to a couple lawyers about it.
10 Q. Have you ever received any written
11 communication from Wolpoff and Abramson?
12 A. Yes.
13 Q. When did you first -- when did you receive
14 the first written communication?
15 A. It was right after my phone call back in
16 November, and they were notifying me that they got
17 the account from MBNA and that I could argue it or
18 get proof, something to that effect.
19 Q. Okay.
20 A. And I sent it back to get proof.
21    MR. PAYNE: Can I have this marked as
22 Defendant's 2, please?
23 A. Also when I got that, again, I wrote them a
24 letter explaining my situation.
25 Q. (By Mr. Payne) Okay.

**Page 21**

1        (Defendant's Exhibit 2 marked for
2  identification.)
3  Q. (By Mr. Payne) Ms. Worch, I'm going to hand
4  you what's been marked as Defendant's Exhibit 2. Is
5  this a letter that you've just identified?
6  A. I believe it is, yeah.
7  Q. Okay. And this is the initial
8  correspondence that you received?
9  A. Mailwise, yes.
10 Q. Okay. Well, let me back up then.
11    Were there -- did you have any other
12 conversations regarding this account prior to this
13 letter?
14 A. The one I had on the phone. Is that what
15 you mean?
16 Q. Yes.
17 A. I had the phone conversation and then a
18 couple days later I got this letter.
19 Q. Okay. And no other conversations in between
20 there regarding this account?
21 A. No.
22 Q. Do you know who this letter is from?
23 A. I have no -- I mean, other than it says
24 Wolpoff and Abramson. I don't know whose signature
25 that is.

1   A.  I'm a -- well, now I'm the extrusion
2   supervisor.
3   Q.  How long have you worked at Vanguard
4   Plastics?
5   A.  Since October 1st of 2006 -- 2005.
6   Q.  What did you do prior to that?
7   A.  I was going to school prior to that.
8   Q.  Where were you attending school?
9   A.  St. Charles Community College.
10  Q.  What time period did you attend St. Charles
11  Community College?
12  A.  May through October 2005.
13  Q.  Did you receive an associates degree?
14  A.  From St. Charles Community College?
15  Q.  Yes.
16  A.  No, sir.
17  Q.  From May 2004 you said?
18  A.  No. 2005.
19  Q.  May 2005?
20  A.  Right. Until October.
21  Q.  Okay. What were you doing before May 2005?
22  A.  I was working at Home Depot.
23  Q.  How long did you work there?
24  A.  About five months.
25  Q.  Was there a time since November of 2004

Page 6

1   through the present that you were unemployed?
2   A.  Yes, sir. I was laid off in December of
3   2004.
4   Q.  Where were you laid off from?
5   A.  American Airlines.
6   Q.  What were you at American Airlines?
7   A.  A maintenance and engineering production
8   specialist.
9   Q.  How long had you worked at American?
10  A.  Over eight years.
11  Q.  Currently married to Rita Worch?
12  A.  Yes, sir.
13  Q.  How long have you been married?
14  A.  About eight years.
15  Q.  What's your date of birth?
16  A.  3/10/62.
17  Q.  And your Social Security number?
18  A.  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.
19  Q.  Have you ever been convicted of a felony
20  before?
21  A.  No, sir.
22  Q.  Are you a plaintiff -- are you aware that
23  you're a plaintiff in a claim that's been filed
24  against Wolpoff and Abramson, Kevin Grillion and
25  Kellerman Investigations?

Page 7

1   A.  Yes sir.
2   Q.  And are you aware that I represent Wolpoff
3   and Abramson?
4   A.  Yes, sir.
5   Q.  Okay. We're here today to take your
6   deposition in relation to that case.
7   A.  Yes, sir.
8   Q.  When was the first time that you ever had
9   any communication with Wolpoff and Abramson, LLP?
10  A.  The first time me personally?
11  Q.  Correct.
12  A.  It would have to be sometime in November. I
13  couldn't tell you exact dates.
14  Q.  November of what year?
15  A.  2005.
16  Q.  Okay.
17  A.  I'm sorry. 2004, I believe.
18  Q.  2004. Is that the first time you'd ever
19  heard of Wolpoff and Abramson?
20  A.  Yes, sir.
21  Q.  And how did you communicate with Wolpoff and
22  Abramson in November of 2004?
23  A.  In November of 2004 Wolpoff and Abramson,
24  one of their agents, initiated a call to my home that
25  I had answered.

Page 8

1   Q.  Do you know the individual's name?
2   A.  No, I do not recall.
3   Q.  Do you know what time that you received the
4   call?
5   A.  It was sometime in the afternoon. I'd say
6   about three or four, but I don't know the exact time.
7   Q.  Okay. Did the individual identify him or
8   herself?
9   A.  He identified himself but he spoke very
10  quickly. The only thing I recall him saying after
11  his name is I'm a representative of Wolpoff and
12  Abramson.
13  Q.  Okay. What happened next?
14  A.  He asked to talk to my wife, and I told him
15  my wife was not able.
16  Q.  What happened after that?
17  A.  And he started to give me information
18  concerning a debt she owed; that they were going to
19  do anything they needed to do to collect that debt.
20  And along those lines they would do anything along --
21  whatever it took to take my home, take my car and to
22  garnish my wages.
23  Q.  Are you paraphrasing or are you saying
24  exactly what this individual --
25  A.  He exactly said do you know we can take your

Page 9

**Page 10**

```
1   home, we can take your car, we can garnish your
2   wages. Exact words.
3       Q.  Okay. And that was -- now, if we can, I
4   just want to make sure I'm getting this down. If we
5   can actually go through what you recall of the
6   telephone conversation and you can say what was said
7   to you, how you responded or what you said and how
8   this individual responded.
9       A.  I said, hello. He said, yes. Is Rita Worch
10  there? I said, she is not available. Can I help
11  you. He said his name and Wolpoff and Abramson and
12  I'm calling in relation to a debt she owes. And I
13  said, okay. And he said, you know, you owe this much
14  money. I said, no. That's my wife's debt and you'll
15  have to talk to her when she's available. And he
16  said, do you realize -- well, his next question was
17  do you work. I said, yes. He said, do you realize
18  we can take your wages. I said, really. He said, do
19  you realize we can take your home. I said, is that
20  so. He said, do you realize if you have any cars, we
21  can take them all. I said, I did not know that. I
22  said, but I'm surprised to learn that. He said, oh,
23  yes. We can take everything you have.
24      Q.  Was that the end of the conversation?
25      A.  No. The next question I had was do you have
```

**Page 11**

```
1   a supervisor and he said, well, I don't have one here
2   right now. And I said, well, okay. Then I don't
3   have anything else to say to you and I hung up.
4       Q.  And that's the best -- your best
5   recollection of the telephone conversation you had?
6       A.  Yes, sir.
7       Q.  Okay. Did you ever have any other telephone
8   conversation with any individual representing Wolpoff
9   and Abramson or anyone suggesting they represented
10  Wolpoff and Abramson?
11      A.  No, sir. Not after that.
12      Q.  Okay. Did you ever have any written
13  correspondence with anyone from Wolpoff and Abramson?
14      A.  Not me, no.
15      Q.  Okay. We've previously marked Exhibit 7.
16  Do you recognize that document?
17      A.  Yes, sir. It's a document I wrote. I don't
18  remember the exact date. Sometime in July, I guess,
19  but I don't remember the exact date.
20      Q.  Okay. July of 2005?
21      A.  Yes, sir.
22      Q.  Did you write this at the request of your
23  wife?
24      A.  No, sir.
25      Q.  Why did you prepare this correspondence?
```

**Page 12**

```
1       A.  We had tried to contact -- or we had tried
2   to get information from attorneys to get assistance.
3   Attorneys gave us information along the lines that if
4   you communicate to Wolpoff and Abramson, explain your
5   situation, they may be understanding as most credit
6   card companies would be. So we tried that because we
7   had no money to pay attorneys. We had no money to
8   chase legal fees. So this was the suggestion they
9   gave us.
10          Following legal suggestion we took this
11  action. It was not done with my wife's knowledge.
12  It was something that was done between me and her
13  parents. We sat and we talked and said, look, the
14  stress and everything is building. We need to try to
15  find some way to calm this situation down.
16      Q.  And so you prepared this without the
17  knowledge of your wife?
18      A.  I had showed it to her after we had prepared
19  it.
20      Q.  Okay. Did you actually send this letter?
21      A.  Yes. Well, she mailed it but I addressed it
22  and all that good stuff.
23      Q.  Okay. Who did you send it to?
24      A.  Wolpoff and Abramson.
25      Q.  Did you send it to anyone else?
```

**Page 13**

```
1       A.  No. Just Wolpoff and Abramson.
2       Q.  At this time had a claim already been filed
3   and had you already received a --
4       A.  My wife had, yes. By claim you mean that
5   they were saying that she owed money? Yes.
6       Q.  Correct. Okay. Well, what's the date on
7   this?
8       A.  The date stamped for received is the 26th
9   and there's another one up top. I guess it says
10  received. Is that what it says underneath there? It
11  says the same date.
12      Q.  Okay. So would this have been after you
13  received -- when you had your interaction with Kevin
14  Grillion and Kellerman Investigation allegedly?
15      A.  I'm trying to think. No. It would be
16  before.
17      Q.  Okay. When did you have --
18      A.  I'm sorry. You're right. After.
19      Q.  Okay. So this is what you took in response
20  to receiving the claim?
21      A.  Right.
22      Q.  And you know what I mean by the claim?
23      A.  Right. Those statements saying we owe
24  money, basically.
25      Q.  Okay. And I believe it's Exhibit 6. These
```

Case: 4:05-cv-01884-HEA Doc. #: 87-2 Filed: 12/14/06 Page: 6 of 7 PageID #: 479
Deposition of Kevin Schoeller                                                    Joseph Torch vs.
10/20/2006                                                              Wolpoff & Abramson, LLP, et al.

Page 5

INDEX
EXAMINATION
                                    PAGE
Questions by Mr. Payne          6
Questions by Ms. Jenkins        14

EXHIBITS
DEFENDANT'S EXHIBIT              PAGE
AA - Letter                      13

Page 6

KEVIN SCHOELLER,
of lawful age, being produced, sworn and examined on
behalf of the Defendant-Wolpoff & Abramson, deposeth
and saith:
         EXAMINATION
QUESTIONS BY MR. PAYNE:
    Q: Could you please state your name?
    A: Kevin Schoeller.
    Q: Mr. Schoeller, is that how you pronounce it?
    A: Uh-huh.
    Q: My name is Michael Payne. I represent the
law firm of Wolpoff & Abramson, L.L.P. We're here
today to take your deposition.
    During the course of the deposition, I'm
going to ask you a series of questions. The Court
Reporter is taking everything down that we say, and
so certainly the Court Reporter won't be able to
know if you -- you have to verbalize your answers
verbally. And also, we'll try -- I'll try to let
you fully complete your question -- or your answer
before I go into the next question so the Court
Reporter can take everything down accurately. Have
you ever had your deposition taken before?
    A: No, I haven't.
    Q: Can you please state your ad[dress]

Page 7

    A: 14 Foster Lane.
    Q: And where is that located?
    A: Wentzville.
    Q: And do you know approximately the mileage
that it took for you to get here today?
    A: It was 45 miles from there to here.
    Q: And are you expecting a witness fee for
appearing today?
    A: Yes.
    Q: Are you currently employed?
    A: Yes.
    Q: With whom are you employed?
    A: STL Distributions.
    Q: What do you do at STL Distributions?
    A: Throw the Post-Dispatch.
    Q: How long have you been doing that?
    A: Going on three years.
    Q: Are you currently married?
    A: No.
    Q: What's your date of birth?
    A: 5/21/82.
    Q: And your social security number?
    A: 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.
    Q: 8452?
    A: Uh-huh.

Page 8

    Q: Thank you. Have you ever been convicted of
a felony?
    A: No.
    Q: Are you aware of a dispute -- strike that.
Are you aware that there's a pending lawsuit in
Federal Court regarding your mother and your
stepfather versus Wolpoff & Abramson, Kevin Grillion
and Kellerman Investigations?
    A: No.
    Q: Okay. When was the first time that you
became aware of this lawsuit?
    A: When I got asked if I made a phone call.
    Q: And when -- who asked you if you made a
phone call?
    A: My mom had actually asked me if I made a
phone call.
    Q: And when was this?
    A: I'm not exactly sure, I just know it was a
while ago.
    Q: When you say "a while ago," are we talking a
time frame of two weeks ago, a month ago, a year
ago?
    A: Probably within six months to a year ago,
something like that.
    Q: And that's the first time that you became

EXHIBIT "C"

Case: 4:05-cv-01884-HEA   Doc. #: 87-2   Filed: 12/14/06   Page: 7 of 7 PageID #: 480

Rita C. Worch, Joseph A. Worch vs.
Wolpoff & Abramson, LLP, et al.

Deposition of Kevin Schoeller
10/20/2006

### Page 9

[1] aware of this?
[2] A: Yes.
[3] Q: And what did you become aware of?
[4] A: That somebody's saying that I made a phone
[5] call that I've never made.
[6] Q: And your mother indicated this to you?
[7] A: Yes.
[8] Q: Your mother being Rita Worch?
[9] A: Yes.
[10] Q: And between six months and one year ago, is
[11] it your testimony that your mother inquired whether
[12] or not you had made a telephone call?
[13] A: Yes.
[14] Q: What else did you discuss besides that
[15] telephone call?
[16] A: That's all I know about about any of this.
[17] Q: Do you -- are you aware that this is a
[18] dispute regarding an MBNA America Bank?
[19] A: No.
[20] Q: About a credit card?
[21] A: No.
[22] Q: Have you ever -- you've never been an
[23] authorized user with your mother on an MBNA America
[24] Bank card, have you?
[25] A: No.

### Page 10

[1] Q: When did you first hear of the law firm
[2] Wolpoff & Abramson?
[3] A: When I had a little thing delivered to my
[4] door last week.
[5] Q: Are you referencing the subpoena that was --
[6] A: Yeah.
[7] Q: -- served? Before that, you had never heard
[8] of the law firm of Wolpoff & Abramson?
[9] A: Before that, I haven't.
[10] Q: Okay. Did you make a telephone call to
[11] Wolpoff & Abramson on November 20th, 2004?
[12] A: No, I didn't.
[13] Q: Have you ever made a telephone call to
[14] Wolpoff & Abramson?
[15] A: No, I haven't.
[16] Q: Have you ever made a telephone call
[17] regarding a debt owed by your mother?
[18] A: No, I haven't.
[19] Q: Have you ever spoke with an individual named
[20] Marquea (phonetic) Chase?
[21] A: No, I haven't.
[22] Q: Have you ever spoken with any employee of
[23] Wolpoff & Abramson?
[24] A: No, I haven't.
[25] Q: Did you ever inform Wolpoff & Abramson that

### Page 11

[1] your mother, Rita Worch, had serious cancer?
[2] A: No.
[3] Q: Did you ever inform Wolpoff & Abramson that
[4] your mother lacked funds to pay a debt?
[5] A: No.
[6] Q: Did your mother ever live in an assisted
[7] living facility?
[8] A: No.
[9] Q: Did you ever inform anyone that your mother
[10] lived in an assisted living facility?
[11] A: No.
[12] Q: Did you ever indicate to anyone at Wolpoff &
[13] Abramson that your mother's mind was not clear?
[14] A: No.
[15] Q: Have you ever indicated to anyone at Wolpoff
[16] & Abramson that you could not -- that your mother
[17] could not make her own decisions because of
[18] medications?
[19] A: No.
[20] Q: Have you ever indicated to anyone at Wolpoff
[21] & Abramson that your mother was unstable?
[22] A: No.
[23] Q: Have you ever made those representations
[24] regarding instability, medications, or mind not
[25] being clear to anyone who you believe or knew of to

### Page 12

[1] be collecting a debt for your mother?
[2] A: No.
[3] Q: Have you ever spoken with anyone regarding
[4] debts of your mother?
[5] A: No.
[6] Q: Have you ever wrote a letter on your
[7] mother's behalf to any creditors?
[8] A: No.
[9] MR. PAYNE: Can you mark this as exhibit I
[10] guess --
[11] MS. WORCH: He has no knowledge of any of
[12] this.
[13] MS. LUMPKINS: You know, he's already said
[14] he knows absolutely nothing, and part of the issue,
[15] in fact, the Motion To Quash with his brother is
[16] that we think these things are done to intimidate,
[17] to embarrass.
[18] Mr. Schoeller has testified that his mother
[19] never talked about the financial stuff, that he
[20] didn't talk to anybody about it, and showing him
[21] letters that are -- his stepfather said that he
[22] wrote, I just --
[23] MS. WORCH: My kids had nothing to do with
[24] those letters, and we've stated that in our
[25] deposition.